MORRIS R. and PANSY R. HILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hill v. Commissioner
Docket No. 1560-71.
United States Tax Court
T.C. Memo 1976-139; 1976 Tax Ct. Memo LEXIS 264; 35 T.C.M. (CCH) 617; T.C.M. (RIA) 760139; May 3, 1976, Filed Jack W. Hawkins, for the petitioners. Frank C. Hider, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(a) [1]/ as follows: Addition Year
Deficiency
to Tax
1965
$127,091.32
$6,354.57
1966
$ 38,046.77
1,902.34
Concessions having been made by the parties, *265 the following issues are left for decision: 1. Whether petitioners had unreported taxable income represented by certain bank deposits made by petitioners in 1965. 2. Whether petitioners are entitled to a deduction of $1,700 as a result of the abandonment of an allegedly worthless gas lease assigned to the Federal Deposit Insurance Corporation in 1966. 3. Whether petitioners are liable for additions to tax under section 6653(a) for 1965 and 1966. FINDINGS OF FACT 1. General
Petitioners Morris R. Hill (hereinafter referred to as petitioner or Hill) and Pansy R. Hill, husband and wife, were legal residents of Ennis, Texas, at the time their petition was filed. They filed joint Federal income tax returns for 1965 and 1966 with the District Director of Internal Revenue, Dallas, Texas. From February 1962 through January 1966, Hill was president and controlling shareholder of Blanket State Bank (hereinafter BSB), Blanket, Texas. In July 1965, he purchased control of the First State Bank of Bangs (hereinafter FSB), Bangs, Texas, and from August 1965 through January 1966, Hill served as president of FSB. On or about January 25, 1966, the directors of BSB, recognizing *266 that it was insolvent, placed BSB in the hands of the Banking Commissioner of the State of Texas. On January 29, 1966, BSB's assets and liabilities, including indemnity bonds issued by the Home Indemnity Company, Dallas, Texas, were assigned to the Federal Deposit Insurance Corporation (hereinafter referred to as the FDIC). James W. Duvall (hereinafter Duvall) was appointed by the FDIC as the liquidator in charge of BSB. On February 15, 1966, Hill gave the Federal Bureau of Investigation (hereinafter FBI) a lengthy statement in which he admitted numerous illegal activities which had led to BSB's insolvency and to a large loss by FSB. These activities resulted in a $230,000 consent judgment against BSB's indemnitor in a suit brought by the FDIC. On May 5, 1966, three indictments were returned against Hill in the United States District Court for the Northern District of Texas, charging him with 33 counts of criminal violations in connection with his management of BSB. On June 23, 1966, he pleaded guilty to, and was convicted on, one count of each indictment, including a charge of "unlawfully, knowingly and wilfully devising and intending to devise a scheme and artifice to defraud *267 and obtain money and property by means of false and fraudulent pretenses from a bank." Hill was given two 2-year prison sentences to run consecutively and one 2-year sentence to run concurrently. When the FDIC took control of BSB's records, it also appropriated all of Hill's personal records located in the bank. These records included ledger sheets, cancelled checks, bank statements, and deposit slips. While most of BSB's records were destroyed by the FDIC, Hill's personal records were returned to him several years before the trial of this case. 2. Reconstruction of Taxable Income
Petitioners maintained two accounts at BSB--the "Morris and Pansy Hill Account" (sometimes referred to herein as Hill's personal account) and the "Morris Hill Oil and Gas Account." From the latter account Hill financed substantial oil and gas leasing and drilling activities. Some of the deposits in these accounts represented transfers between accounts or were derived from nontaxable transactions. Since petitioners' records did not explain all the deposits, respondent determined the deficiencies here in dispute by use of the bank deposits and cash expenditures method of income reconstruction. *268 In their stipulation and briefs, the parties have limited the disputed gross income items to the seven deposits listed below. A. Morris and Pansy Hill Account--October 8, 1965, deposit of $8,000 and October 9, 1965, deposit of $1,000
On September 23, 1965, petitioner drew a check in the amount of $8,567.78 on his personal account at BSB payable to Mrs. Ernest Allen. The check was drawn to pay a note to Mrs. Allen which Hill had given her to cover the purchase price of stock in BSB. On October 7, 1965, Hill prepared a deposit slip to credit his personal checking account at BSB with $8,000. The credit to his account was made on October 8, 1965. The deposit slip carried the notation "Note, FNB, Dallas, Stock, Mrs. Allen." On October 9, 1965, Hill deposited an additional $1,000 to the same account at BSB and on the deposit slip described the deposit as a "loan." No promissory note was executed for this loan. On October 9, 1965, BSB paid the $8,567.78 check issued to Mrs. Ernest Allen. B. Morris Hill Oil and Gas Account
Beginning in 1964 and continuing through January 1966, Hill was engaged in the oil and gas business. Hill and Edward Rosenberg (hereinafter *269 Rosenberg) became partners in the operation of several oil and gas leases. Hill used his oil and gas account at BSB to defray some of the drilling expenses which he and Rosenberg incurred. (1) June 3, 1965, deposit of $3,300
On May 12, 1964, Hill set up on BSB's books a loan of $12,500 in the name of Fritz Templin (hereinafter Templin) without Templin's knowledge or consent.Of this $12,500, $5,000 was used to cover overdrafts on Rosenberg's account at BSB. The other $7,500 was used to finance Hill's oil and gas ventures. On May 14, 1965, when the note in Templin's name became due, Hill obtained $9,000 from BSB by means of a note signed in the name of his brother, Robert Hill. His brother did not give his authorization or consent to such note and had no knowledge of the transaction.Of the $9,000, $720 was treated as a charge for interest, $138.60 was used as a credit insurance premium, and $8,141.40 was deposited in a "Robert Hill Special" account. On May 24, 1965, Hill applied $4,760.33 from this account against the Templin note. On June 3, 1965, he transferred $3,300 to his oil and gas account. When BSB was taken over by the FDIC, $81.07 remained in the "Robert Hill *270 Special" account. (2) June 8, 1965, deposit of $2,000 and September 11, 1965, deposit of $5,500
In addition to the $12,500 purportedly borrowed by Hill and Rosenberg by use of the fictitious Templin note of May 12, 1964, Hill made other false entries in BSB's records to cover Rosenberg's overdrafts. On December 31, 1964, BSB was holding over $18,000 in Rosenberg's overdrafts. To cover these overdrafts, Hill prepared a fictitious deposit slip denoting BSB's receipt of $20,000 for Rosenberg's account. The deposit was offset in BSB's records by overstating "Currency in Vault" by the same amount. To cover up this $20,000 overstatement of currency, Hill placed a fictitious loan of $10,000 on BSB's books in the name of B. U. Ross on January 16, 1965. On the same date, he placed a fictitious note for $1,000 on BSB's records in the name of W. R. McCartney. On January 25, 1965, Hill placed a fictitious loan of $10,000 on BSB's books in the name of Heston McBride. On May 15, 1965, the McCartney note was rewritten in the amount of $10,000. Of the additional $9,000 represented by the McCartney note, $242.22 was credited to BSB as interest, and $8,775.78 was applied as a payment *271 of the balance of the Templin note. On June 8, 1965, $2,000 was credited to Hill's BSB oil and gas account, and on September 11, 1965, $5,500 was credited to the same account. These credits were made by Hill or at his direction, and no notes were given by him to document the transactions as loans. On July 16, 1965, Hill prepared a fictitious deposit slip purporting to show the receipt of $30,000 in Rosenberg's account, which was then overdrawn to the extent of $26,317.84. To offset this purported deposit, a false entry was made in BSB's records to overstate the "Currency in Vault" by $30,000. To correct this overstatement, Hill obtained a $30,000 cashier's check from FSB, and deposited that check in BSB. He obtained the $30,000 from FSB by directing employees of that bank to post a fictitious $30,000 deposit to his account in that bank. This $30,000 was later offset by entries using a $30,000 check drawn on BSB by Dean Sliger. When the FDIC and State bank examiners appeared at BSB on January 21, 1966, checks in excess of $70,000 which Rosenberg had drawn on his account were being held as overdrafts. (3) October 9, 1965, deposit of $5,000
On October 9, 1965, $5,000 *272 was deposited in Hill's oil and gas account. The deposit slip carries the notation "Loan--FSB Bangs." The FDIC and revenue agents' workpapers refer to the deposit as a loan, but Hill did not execute a note to document the deposit as a loan to him. (4) December 29, 1965, deposit of $35,000
During the last 6 months of 1965, Hill needed large sums of money to pay the costs of his oil and gas operations. In August 1965, he met with Lonnie Sikes (hereinafter Sikes), who was engaged in the real estate and insurance business in Bangs and Blanket, Texas. Sikes assisted Hill in attempting to obtain a loan of $350,000 from the Continental Life Insurance Company to enable Hill to consolidate his indebtedness and to assist in restoring BSB to solvency. Sikes was aware Hill had serious financial problems but did not know all the details. Sikes' efforts on Hill's behalf continued until shortly before BSB's closing on January 25, 1966. On November 16, December 1, and December 9, 1965, Hill wrote checks on his oil and gas account in the respective amounts of $5,407.50, $2,856, and $4,000. These checks remained unpaid on December 14, 1965, and he had only $213.25 in his account. Other *273 expenses were to come due within the near future. On December 14, 1965, Hill drew a check for $34,000 on his FSB account and deposited the check in his BSB oil and gas account on that date. The resulting credit entry was used to pay the three outstanding checks referred to above, and to defray other costs of the oil and gas operations. At the time Hill drew the $34,000 check on December 14, 1965, the balance in his FSB account was only $983.17. However, that account was not debited for the December 14, 1965, $34,000 check until December 20, 1965, and, in the meantime, on December 17, 1965, the account was credited with a deposit in the amount of $35,000. The source of the December 17, 1965, deposit at FSB (which covered the $34,000 check) was a check dated December 17, 1965, drawn by Sikes on his account at the Midland National Bank (hereinafter MNB). On the same date, in exchange for Sikes' $35,000 check, Hill gave Sikes a check for $35,000 drawn on his BSB oil and gas account. The balance in Hill's oil and gas account on that day was insufficient to cover a check in such amount. Hill's oil and gas account, however, was not debited to reflect the $35,000 check on that *274 date.On December 20, 1965, Sikes deposited in MNB the $35,000 check dated December 17, 1965, drawn on Hill's oil and gas account. On December 29, 1965, Hill's BSB oil and gas account was credited with a deposit of $35,000, and on December 31, 1965, the check written by Hill on December 17, 1965, to the order of Sikes in the amount of $35,000 was paid by BSB.The source of the December 29, 1965, deposit was a check payable to "Morris Hill Oil & Gas Acct." drawn on the personal account of T. M. Young (hereinafter Young) at FSB. Young owned a manufacturing business in Bangs and had become acquainted with Hill in August 1965. Hill had previously entered into a purported sale of a gas lease to Young but never completed the transaction. Hill caused Young's name and the word "By" to be typed on the drawer's line of the check, and Hill signed his own name on the check below Young's name and following the word "By." Young did not authorize this draft on his account, and had no knowledge of it. In addition to the aforementioned checks, Hill wrote checks totaling approximately $60,000 which were paid on December 31, 1965, from his oil and gas account. On that same day, he deposited in *275 his oil and gas account a check for $60,000 drawn on his account at FSB. The balance in the oil and gas account would have been inadequate to cover the December 17, 1965, check to Sikes without the deposit of the "Young draft" on December 29, 1965. The "Young draft" was presented for collection at FSB on January 4, 1966. Young was contacted by Geneva Starkey (hereinafter Starkey), cashier at FSB. Young disavowed the check and refused to honor it. Starkey notified Hill and he advised her that he had drawn the $35,000 on the "wrong person" and that a draft should have been drawn on Sikes. Sikes was not in his office on January 4, 1966, when Young declined to honor the check. Hill contacted Sikes' secretary, Mary Williams (hereinafter Williams), and advised her that his draft on Young for $35,000 was erroneously drawn on Young and should have been drawn on Sikes. Hill asked Williams to accept and pay the $35,000 draft in Sikes' name. Although Williams advised Hill that she had no such authority, Hill assured her that he would explain everything to Sikes upon his return to the office. With this assurance, Williams prepared a draft for $35,000 on MNB payable to Sikes and *276 executed it in his name "By: Mary Williams." Williams deposited the $35,000 draft on MNB in Sikes' account at FSB on January 4, 1966. Williams also accepted Hill's "Young draft," by writing "L. B. Sikes, Sikes Insurance Agency" across the bottom of this draft. Thereafter and with Hill's approval, as president of FSB, the "Young draft" was charged to Sikes' account at FSB. Sikes subsequently arranged with Hill to cover the $35,000 draft on Sikes' account at MNB executed in his name by Williams. Hill had Sikes draw two checks, one for $18,750 and one for $16,750 from Sikes' BSB and FSB accounts, respectively, payable to MNB. On January 7, 1966, Sikes deposited the checks at MNB with Hill's assurances that the checks would be paid when presented by MNB. Sikes' checks for $18,750 on BSB and for $16,750 on FSB were covered or paid in the following manner: On or about January 12, 1966, when the check for $16,750 on FSB was presented by MNB for payment, Hill requested Sikes to draw a check for $17,000 on Sikes' account at BSB, which Sikes did. On January 12, 1966, Sikes then deposited the $17,000 check on BSB in his account at FSB and, with Hill's approval, as president of FSB, *277 the $16,750 check dated January 6, 1966, on Sikes' account was paid by FSB. On or about January 14, 1966, when Sikes' check for $18,750 on BSB was presented for payment from MNB, Hill again approached Sikes and requested Sikes to draw a check for $18,750 on Sikes' account at FSB payable to BSB, which he did. Sikes deposited this $18,750 check in his account at BSB and, with petitioner's approval, as president of BSB, the prior check for $18,750 on Sikes' account was paid by BSB. In order to cover Sikes' check of January 12, 1966, on BSB for $17,000, on January 18, 1966, Hill prepared and executed a draft payable to BSB for $17,000 on Sikes' account at FSB without Sikes' authority or knowledge. With Hill's approval, as president of BSB, Sikes' check of January 12, 1966, for $17,000 was paid. In order to cover Sikes' check of January 14, 1966, on FSB for $18,750, described above, on or about January 21, 1966, Hill requested that Sikes draw checks for $10,000 and $8,750 on Sikes' account at BSB and deposit these checks in Sikes' account at FSB, which Sikes did. Thereupon, Hill, as president of FSB, approved payment of Sikes' previous check of January 14, 1966, for $18,750. *278 On or about January 25, 1966, when the FDIC and State bank examiners came to both BSB and FSB, and BSB was closed, Hill's draft of January 18, 1966, for $17,000 on Sikes' FSB account was returned to BSB unpaid, and Sikes' checks for $10,000 and $8,750 of January 21, 1966, on his BSB account were returned to FSB unpaid. Petitioner, acting as president of both banks, approved these items and permitted them to remain at both banks, causing losses to BSB of $17,000 and to FSB of $18,750. 3. Loss in Respect of Allegedly Worthless Oil and Gas Lease
After BSB was closed in 1966, Hill transferred most of his assets to the FDIC as partial restitution for the losses which he had caused the bank to incur. These transfers included payments totaling $12,088.42 which were recorded on credit receipts furnished petitioner by Duvall, the liquidator appointed by the FDIC. Included in that sum is the value of certain gold coins which Hill turned over to the FDIC. In addition, $21,110.13 was credited to Hill by the FDIC as restitution payments attributable to income earned from oil and gas leases which he had assigned to the FDIC. Among the leases assigned to the FDIC was one described *279 as the Culberson lease. Hill acquired the lease in 1965 at a cost of $1,700 and began drilling a gas well on the property in November or December of that year. In November 1965, in order to cover drilling costs, Hill arranged an abortive sale of a 1/4 interest in the Culberson lease to Young for $6,000. On December 16, 1965, a "Report on Various Leases Operated by Morris Hill" was submitted to Hill by a consulting engineer in support of an application for a large bank loan. In that report, it was concluded that the Culberson gas lease had a potential cash flow of $25,000. On March 1, 1966, Hill executed an assignment of oil, gas, and mineral leases which transferred his entire interest in the Culberson lease to the FDIC. On March 8, 1966, Hill received a report by West Texas Petro Lab which estimated the total value of the gas reserved under the lease at $114,400. The report stated: "The gas reserves on the * * * Culberson lease * * * are proven." During the months of July, August, and September 1966, the Culberson lease produced gross income of $65.88, $52.92, and $9.85, respectively. No production occurred in October, November, or December of that year.On or about February 1, 1967, the *280 Culberson lease was transferred to a bank in Brownwood, Texas, pursuant to a court order. ULTIMATE FINDINGS OF FACT 1. Petitioners had unreported taxable income represented by the following deposits at issue in this case: Oil and Gas
Account
Morris and Pansy
Hill Account Date
Amount
Date
Amount
6/ 3/65
$ 3,300
10/ 8/65
$8,000
6/ 8/65
2,000
10/ 9/65
1,000
9/11/65
5,500
10/ 9/65
5,000
12/29/65
35,000
2. The Culberson lease did not become worthless, within the meaning of section 165(a), during 1966. 3. Part of the deficiency determined by respondent was not due to negligence or intentional disregard of rules and regulations by petitioners within the meaning of section 6653(a).
OPINION In the notice of deficiency, respondent determined that petitioners had unreported income of $53,770.24, reflected by unexplained deposits in the Morris and Pansy Hill account, and $150,800 in 1965 and $100,000 in 1966 reflected by unexplained deposits in Hill's oil and gas account. The parties have agreed on the proper tax treatment of numerous deposits, leaving in dispute only the ones listed in our Ultimate Findings of Fact. 1. General
*281 Petitioners contend: (1) That respondent lacked authority to reconstruct their income under the bank deposits method since petitioners allegedly maintained records from which their income could be calculated, see ; (2) that respondent's determination was arbitrary and excessive and, therefore, the burden of proof should rest with respondent to uphold his determination, citing ; and (3) that petitioners have shown that the deposits are traceable to nontaxable sources. The first two arguments clearly lack merit. Hill made numerous large deposits in his bank accounts, and those deposits were not identified or explained by his books or records.Since Hill regularly engaged in income-producing business activities and confessed to misappropriations from BSB, respondent was fully justified in utilizing an indirect method of income reconstruction to test the accuracy of petitioners' income tax returns and to redetermine their taxable income.See ; , *282 affg. a Memorandum Opinion of this Court, cert. denied ; ; . It is true that respondent has conceded that his agents erred in treating numerous individual bank deposits as taxable income. But it is settled that concessions and stipulations as to parts of a determined deficiency do not relieve a taxpayer of his normal burden of proof in respect of the remainder of the deficiency. , affd. , cert. denied ; , affd. per curiam . Moreover, even if petitioners' evidence should show that some of the other deposits were not income, it would not follow that respondent's use of the bank deposits method was arbitrary. , on appeal (6th Cir. Apr. 5, 1976). Petitioners' third argument--that the seven deposits remaining in dispute are traceable to *283 nontaxable sources--requires an analysis of the evidence in respect of each such deposit. 2. Reconstruction of Taxable Income
A. Morris and Pansy Hill Account--October 8, 1965, deposit of $8,000 and October 9, 1965, deposit of $1,000
Petitioners contend that these two deposits represented the proceeds of loans which Hill obtained from BSB and were, therefore, nontaxable. To support this contention, petitioners adduced as evidence deposit slips bearing notations of loans in these amounts together with Hill's testimony that these deposits were loan proceeds. Respondent maintains that these deposits were the proceeds of Hill's misappropriations. Hill testified that he had purchased shares of BSB stock from Mrs. Ernest Allen and had given her a note for $8,000. The note became due, and on September 23, 1965, he gave her a check for $8,567.78. At that time, he did not have sufficient funds in his account to cover the check. On October 7, 1965, Hill prepared a deposit slip for $8,000, bearing the notation "Note, FNB, Dallas, Stock, Mrs. Allen," which was credited to his account on October 8, 1965. On October 9, 1965, he prepared a deposit slip to credit his account *284 with $1,000, and on that date the check to Mrs. Allen was paid.
Hill testified: Q. What was the purpose of that deposit to your account? A. It was a loan. Q. A loan from whom? A. It was supposed to have been from the bank, but I don't know if we ever got it finalized or not.
Later in his testimony, he admitted that no note was ever executed evidencing either purported loan. Faced with these admissions by Hill, we are compelled to conclude that these funds were misappropriated and there was never any intention to repay them. Such diversion of funds constitutes taxable income. ; , affg. . B. Morris Hill Oil and Gas Account
(1) June 3, 1965, deposit of $3,300
For some reason unexplained by the record, petitioner's brother, Robert Hill, allegedly signed a blank note payable to BSB and left it at the bank. [2]/ Admittedly without any further authorization from his brother, on May 14, 1965, petitioner filled in the blanks in the note so that it reflected an obligation of $9,000 from Robert *285 Hill to BSB and credited the net amount of $8,141.40 to an account entitled "Robert Hill Special." On June 3, 1965, petitioner transferred $3,300 from this account to his own oil and gas account and used those transferred funds to pay expenses incurred in his oil and gas ventures. Respondent maintains that the $3,300 thus obtained by petitioner was taxable income. Petitioner contends that it was not income but was a loan from his brother who had in turn borrowed the money from BSB. [3]/ We think a fair evaluation of the evidence requires a conclusion that this $3,300 was taxable income. In his statement to the FBI, Hill referred to this transaction as "a fictitious loan I received in the name of my brother * * * on May 14, 1965." In the same statement, he admitted: "On May 14, 1965, I obtained a loan of $9,000.00 from the bank in my brother's name without his knowledge or consent." The record contains no adequate explanation of these statements. *286 Significantly, Robert Hill did not testify, , affg. , and there is no evidence that he ever gave his consent to the purported loan transaction. Petitioner executed no document obligating himself to pay either his brother or BSB the amount of the note. While the transaction no doubt created a technical obligation on petitioner's part to repay the bank or his brother, as in the case of any embezzlement, see e.g., , we cannot find that petitioner ever intended to make repayment except in the vague and indefinite sense common among embezzlers. Where there is no consensual recognition of a bona fide obligation to repay funds taken without authorization, the "borrower's" dominion, control, and use of the funds constitute economic benefits which bring the funds within the broad definition of gross income in section 61. , cert. denied ; , affd. *287 . (2) June 8, 1965, deposit of $2,000 and September 11, 1965, deposit of $5,500
Petitioner contends that these two deposits were derived from repayments of funds petitioner had advanced to his partner, Rosenberg, to finance their oil and gas ventures. Unfortunately, the record contains no documentation of transactions with Rosenberg to support petitioner's contention, and Rosenberg is dead. The issue turns almost completely on the credibility of petitioner's testimony, corroborated to some extent by the testimony of David Wells, a former dealer in oil field supplies. Wells testified that Hill furnished most of the money to pay for materials Hill and Rosenberg purchased from him. Respondent maintains that petitioner's credibility as a witness has been destroyed by his confessed felonious conduct in handling the affairs of both banks. The record contains a long history of misuse of bank funds in Hill's dealings with Rosenberg. As early as May 12, 1964, according to Hill's statement to the FBI, he and Rosenberg "borrowed $12,500.00 in the name of FRITZ TEMPLIN," $5,000 of which was used to cover Rosenberg's overdrafts at BSB. The *288 remaining $7,500 was used to finance Hill's oil and gas investments. [4]/ On December 31, 1964, Hill credited another $20,000 to Rosenberg's account at BSB to cover overdrafts. Hill offset the deposit with a false entry to the "Currency in Vault" account until two fictitious loans were placed on BSB's records. On July 16, 1965, Hill falsified a $30,000 deposit slip to Rosenberg's credit to cover overdrafts, again making a false entry in the "Currency in Vault" account, which he later offset with $30,000 purportedly but not actually transferred from FSB. Hill's FBI statement also states that: "When the FDIC and State Bank examiners appeared at the Blanket State Bank on January 21, 1966, there were checks in excess of $70,000 which ROSENBERG had drawn on his account that were being held by the Blanket State Bank as 'overdrafts'." Given this history of Rosenberg's repeated overdrafts--particularly the accumulations of nearly $30,000 in July 1965 and over $70,000 by January *289 1966--which Hill was covering with false entries in the banks' records, and given no other substantial corroboration of Hill's testimony, we cannot accept Hill's testimony as sufficient to show that his June 8, 1965, and September 11, 1965, deposits were reimbursements of advances to Rosenberg. Hill's testimony contains no details of the circumstances in which Rosenberg, chronically and massively overdrawn in his bank accounts, made these payments to petitioner. Nor has petitioner shown, if Rosenberg did make such payments to him, that the funds were not derived, at least indirectly, from the fictitious loans and other entries Hill made to cover Rosenberg's overdrafts. (3) October 9, 1965, deposit of $5,000
Petitioner testified that this deposit represented a loan from FSB. As corroboration he points to the FDIC and revenue agents' workpapers and a deposit slip which so describe it. Respondent, emphasizing Hill's general lack of credibility, maintains that the FDIC and revenue agents' workpapers merely reflect the notation on the deposit slip, not the investigators' conclusion. We are not convinced that this transaction was a loan. There is no evidence that petitioner *290 ever executed a note to document the transaction as a loan. Significantly, this $5,000 deposit was credited to Hill's oil and gas account around the same dates as the disputed $8,000 and $1,000 alleged loans were credited to the Morris and Pansy Hill account. None of these purported loans was documented with notes. We hold that this deposit, as in the case of the other two deposits, was a misappropriation taxable as income. ; . (4) December 29, 1965, deposit of $35,000
Our Findings set forth the details of a series of exchanges of checks and drafts between December 14, 1965, and January 25, 1966, when the FDIC and State bank examiners entered the picture at both BSB and FSB. Briefly, on December 14, 1965, Hill wrote a $34,000 check on his FSB account which he then deposited in and credited to his BSB oil and gas account. The $34,000 was used to cover overdrafts in the BSB oil and gas account. Since Hill did not have $34,000 in his FSB account, the transfer of December 14, 1965, merely served to transfer the overdrafts from BSB to the FSB account. On December 17, 1965, Hill *291 exchanged $35,000 checks with Sikes and deposited Sikes' check in Hill's FSB account to bring that account into balance. The check Hill gave Sikes was written on Hill's oil and gas account which when paid would merely shift the $35,000 deficit back to the oil and gas account. BSB, however, did not pay the $35,000 to Sikes immediately. On December 29, 1965, Hill drew a check on Young's account at FSB, typed Young's name and the word "By:" thereon, and signed "Morris Hill" after the word "By: ." The instrument was in the nature of a draft on Young's account which Young could honor or refuse to honor. Young was unaware of the draft and had never authorized Hill to take such action. On December 29, 1965, Hill deposited and credited to his oil and gas account the face amount of the draft. On December 31, 1965, he caused BSB to honor and pay the December 17, 1965, $35,000 check he had written to Sikes. Citing , revg. and remg. a Memorandum Opinion of this Court, petitioner maintains that this was only an elaborate "check kiting" scheme which did not create taxable income since each deposit was merely a transfer *292 of funds from one account to another and each receipt was offset by a corresponding obligation to pay an equal sum. Certainly, petitioner emphasizes, there is no ground for isolating the deposit of December 29, 1965, and holding that it is taxable income. Respondent contends that the deposit of December 29, 1965, was not a mere transfer of funds from one account to another but rather a fictitious deposit and credit to his account through which Hill acquired dominion and control over $35,000 of BSB funds through the device of an unauthorized draft. See , affg. a Memorandum Opinion of this Court, cert. denied ; , affd. per curiam ; cf. Charles R. Leaf, 33 T.C. at 1096. The issue is difficult, but we hold for respondent. Hill's relationship to FSB and BSB was unique, and is a major factor supporting our conclusion. As president of both banks, Hill employed his authority to credit his accounts with numerous fictitious deposits, reduce cash balances *293 virtually at will through the vehicle of fictitious loans, and honor and pay checks not supported by sufficient funds. Hill exploited these executive positions throughout the final series of transactions described above. Through these manipulations, Hill acquired dominion and control over $35,000 of BSB's funds prior to the end of the taxable year on December 31, 1965. This amount was credited to Hill's BSB oil and gas account on December 29, 1965, and used to honor Hill's check to Sikes dated December 17, 1965. Any bank officer lawfully discharging his responsibilities as such, knowing Young had not authorized the December 29, 1965, check, would not have made this credit to Hill's account and honored Hill's check to Sikes. Hill used his control of the two banks to obtain an economic benefit in the form of this credit which was sufficient to render the deposit taxable as income within the meaning of section 61. See ; ; cf. . The benefit to Hill redouned to the ultimate detriment of FSB and BSB--the *294 two banks lost $35,000 at the time BSB was closed in 1966. Petitioner's contention that the December 29, 1965, deposit was an inseparable link in a chain of check kites is without merit. Check kiting merely exploits the time lag between the date a check is cashed and the date it is presented to and paid by the drawee bank. Thus, if funds on deposit are inadequate to cover the check on the day it is written, the payor normally will have a few days to cover the check by depositing funds before the check is presented to his bank for payment. The december 29, 1965, deposit, however, did not represent the deposit of cash proceeds from a worthless check written on Hill's FSB account, compare ;, on appeal (6th Cir. Apr. 5, 1976), cited by petitioner, nor a deposit of the worthless check itself. This was not an attempt by Hill to simply exploit a time lag. The credit was the result of a bogus draft on a third party's account. The deposit was in substance no different from those described as "loans" on other deposit slips and no less fictitious. The execution of *295 the draft to accompany the deposit as a means of documenting the credit was without legal significance because Hill knew he had no authority to draw a check on Young's account. The result would be the same had Hill simply made a false entry on BSB's books to document the unauthorized use of bank funds. See . In either case, the credit would represent income realized by Hill. The subsequent abortive coverup of the misappropriation during the next taxable year when Sikes' aid was enlisted to honor the "Young draft" is irrelevant.
3. Loss in Respect of Allegedly Worthless Oil and Gas Lease
The evidence on this issue is confused. In the fall of 1965, Hill completed a gas well on the Culberson lease. In connection with Sikes' efforts to assist Hill in obtaining a substantial loan, a firm of consulting petroleum engineers made an appraisal of the reserves under six leases operated by Hill and in a report dated December 16, 1965, concluded that the well on the Culberson lease had a potential cash flow of $25,000. On March 1, 1966, after BSB failed and Hill's misappropriations were uncovered, Hill assigned *296 the Culberson lease to the FDIC. The assignment is absolute on its face, but the lease was evidently intended to be operated by the FDIC for Hill's benefit. A statement of Hill's oil and gas operations for 1966 shows that he was credited with small amounts of production income (a net of $128.65) from the Culberson lease in July, August, and September 1966. The same statement contains the notation "Dist. Court in Bwd [evidently Brownwood] awarded these leases [including the Culberson lease] to Citizens Nat'l Bk. Bwd (probably as of 2-1-67)." It is true that this statement on Hill's 1966 oil and gas operations also reflects that there was no production from the Culberson lease during October, November, and December 1966, but the record does not show why this was true. With the only detailed engineering data in the record reflecting a potential cash flow of $25,000 from the existing well on the lease as of December 16, 1965, the evidence does not show the lease became wholly worthless in 1966. 4. Additions to Tax Under Section 6653(a)
Respondent determined that part of petitioners' underpayments of tax for 1965 and 1966 was "due to negligence or intentional disregard *297 of rules and regulations." In support of this determination, respondent argues that Hill has not shown that he maintained adequate records or why he failed to report certain 1966 income from his oil and gas operations. Respondent also argues that Hill failed to cooperate with the revenue agent who examined his returns. The merits of respondent's arguments must be weighed in the light of the facts existing when Hill's 1965 and 1966 returns were filed--May 21, 1966, and June 14, 1967, respectively. Prior to both of these dates, on January 25, 1966, BSB was taken over by the FDIC, and Hill's personal records located in the bank were seized. According to Duvall's testimony, Hill's file cabinets were later sold, and the proceeds were credited to his account. Hill's records were thus in the custody of the FDIC when both returns were filed, and such records remained with the FDIC until the revenue agent began his investigation of petitioners' 1965 and 1966 returns in September 1967. Hill told the revenue agent that the FDIC had taken his records, and the agent obtained access to them through the FDIC. The revenue agent's testimony, if relevant at all to this issue, simply does *298 not support respondent's argument that Hill did not cooperate in the examination of his returns. Shortly before Hill's 1965 return was filed, he had been indicted for his misappropriations from BSB. The evidence does not show when he was released from prison, but we infer that his 1966 return was filed before or shortly after his release. Thus, both returns were prepared while his records were in custody of another Government agency--the FDIC. No doubt his 1966 records on the oil and gas operations were incomplete, but he personally participated in those operations at most only 2 months of the year and evidently was incarcerated more than half of the year. Taking all the evidence into account, we think it more reasonable that, within the meaning of section 6653(a), the underpayments of tax for 1965 and 1966 were due to Hill's preoccupation with his criminal prosecution, his subsequent incarceration in a Federal prison, and the FDIC's seizure of his personal records rather than his negligence or willful disregard of the regulations. To reflect the foregoing as well as the disposition of the settled issues, Decision will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue.
2. /↩ The record reflects that other individuals allegedly left signed blank notes at the bank, e.g., Fritz Templin and Laford Green.
3. /↩ The texability of the remainder of the $9,000 is not before the Court.
4. /↩ Part of the money obtained from the fictitious loan in the name of petitioner's brother, Robert Hill, discussed above, was used on May 24, 1965, to reduce the amount outstanding on the Templin note.